**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESTIQ INC.,<br><br>Plaintiff,<br><br>-against-<br><br>CARTESSA AESTHETICS, LLC and EL.EN. S.P.A.<br><br>Defendants. | Case No.: 1:26-cv-8138<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ESTIQ Inc. ("ESTIQ"), by its attorneys Michelman & Robinson LLP, alleges as follows against Defendants Cartessa Aesthetics, LLC ("Cartessa") and El.En. S.p.A. ("El.En.," and collectively with Cartessa, "Defendants").

## NATURE OF THE ACTION

1. This case arises from a manufacturer, El.En.'s, attempt to escape the exclusivity it granted to a distributor, ESTIQ. El.En. granted ESTIQ the exclusive right to market, sell, train providers on, and distribute a medical-aesthetic laser, the TIAC II, in the United States. ESTIQ then invested millions of dollars to build the U.S. market for that technology, as well as the infrastructure to introduce the technology responsibly. After accepting the benefit of those efforts, El.En. has now authorized Cartessa, a direct competitor of ESTIQ's, to sell the same core technology in the same market under different product names.

2. The parties' February 2025 Exclusive Distribution Agreement (the "Agreement") granted ESTIQ the exclusive right to distribute the TIAC II platform in the United States and authorized ESTIQ to use proprietary marks associated with the device, including "ONDA," in marketing the product. That exclusivity was not merely a commercial allocation of

sales rights. The Agreement also placed responsibility on ESTIQ to establish a controlled and accountable distribution channel for the platform, including provider education and training, installation, service, repair, customer support, and compliance with applicable regulatory and safety requirements. These obligations are especially important for medical devices, where fragmented distribution can create uncertainty concerning who is authorized to sell, service, and support the equipment.

3. In reliance on its exclusivity rights under the Agreement, ESTIQ invested substantial resources in sales and service infrastructure for the TIAC II. It spent millions in developing physician and key opinion leader relationships; educating customers; building necessary sales and marketing infrastructure; and other launch efforts necessary to commercialize TIAC II in the United States.

4. In January 2026, ESTIQ learned that ONDA devices—a proprietary name for TIAC II—were appearing in the United States outside ESTIQ's authorized distribution channels. As a result, ESTIQ lost sales and encountered customer confusion concerning the identity of the authorized distributor and service provider. The parallel distribution of the devices also created uncertainty regarding warranty coverage, provider training, adverse-event reporting, and responsibility for product-related liability. ESTIQ promptly raised these concerns with El.En. and sought confirmation that El.En. would honor the exclusive distribution structure established by under the Agreement.

5. El.En. did not provide this confirmation. Instead, El.En. offered shifting explanations designed to avoid its contractual obligations. El.En. first suggested that ONDA devices appearing in the United States had entered through grey-market channels outside El.En.'s control. El.En. then changed course and claimed that ESTIQ had failed to satisfy the Agreement's minimum purchase requirements. This claim was entirely pretextual: ESTIQ had submitted

purchase orders for the required units, which El.En. *acknowledged and confirmed*. Despite these confirmations, El.En. never delivered the units, issued invoices, or gave notice to ESTIQ that payment was due.

6. When those explanations failed, El.En. advanced yet another theory: that ESTIQ's exclusivity did not apply to products branded "ONDA," "bodyESTIQ," or "ONDA PRO" because they were supposedly separate technologies from TIAC II. El.En.'s position is contradicted by the Agreement, the parties' course of dealing, and the commercial and regulatory reality of the products.

7. As an initial matter, a medical device may only be marketed and sold in the United States if it is covered by an applicable clearance from the U.S. Food and Drug Administration ("FDA"). Although TIAC II was marketed under different proprietary names, including ONDA, ONDA PRO, and bodyESTIQ, those names referred to the same underlying device platform and, at the relevant times, relied on the exact same FDA clearance.

8. El.En.'s own communications and regulatory filings confirm that it treated ONDA, ONDA PRO, and bodyESTIQ as equivalent proprietary names for the TIAC II platform. Before this dispute arose, El.En. used these names interchangeably and without distinction in correspondence with ESTIQ and prospective customers. Only after ESTIQ objected to Cartessa's distribution of ONDA devices in the United States did El.En. assert—for the first time—that the products were separate and fell outside ESTIQ's exclusive rights.

9. Moreover, El.En.'s regulatory filings list ONDA PRO as a proprietary name for TIAC II under TIAC II's existing 510(k) clearance.

10. In March 2026, El.En. proposed an "Addendum" to the Agreement seeking to retroactively narrow ESTIQ's exclusivity rights to devices marketed under the TIAC II or bodyESTIQ name and excluding ONDA, ONDA PRO, and related variants. The proposed

Addendum exposed El.En.'s strategy—by asking ESTIQ to exclude ONDA, ONDA PRO and related variants from the Agreement, El.En. effectively acknowledged that those products fell within the scope of the Agreement *unless ESTIQ agreed otherwise*. ESTIQ appropriately refused to sign the Addendum, as permitting El.En. to sell the same device with the same underlying technology—simply with different commercial or brand names—would frustrate the commercial purpose of the Agreement, destroy the value of ESTIQ's bargained-for exclusivity, and undermine the unified system of training, service, support, and accountability that ESTIQ had built for TIAC II technology in the U.S. market.

11. On April 14, 2026, El.En. purported to rescind ESTIQ's contractual license to use the ONDA trademark and demanded that ESTIQ immediately remove the name from its website, marketing materials, and social-media platforms. That demand directly impaired ESTIQ's ability to market TIAC II devices using the proprietary mark expressly identified in the Agreement, while El.En. simultaneously supported Cartessa's use of the ONDA PRO name for the competing launch.

12. Cartessa's conduct compounds the harm. Despite notice of ESTIQ's exclusive rights, Cartessa has marketed the same underlying technology as an authorized ONDA PROduct, creating confusion over who may sell, train on, service, and support the devices. That confusion threatens ESTIQ's goodwill among customers and service providers and, again, undermines the safe and accountable distribution of that technology.

13. Having accepted the benefit of ESTIQ's investment and market-development efforts, El.En. now seeks to avoid its exclusivity obligations by distributing the same TIAC II technology under different product names. Cartessa likewise seeks to benefit from ESTIQ's market-building work by distributing ONDA PROducts despite being on notice of ESTIQ's exclusive rights. Defendants' conduct has impaired and will continue to impair ESTIQ's market

position, customer goodwill, and physician and customer relationships. Defendants' conduct also undermines the consistent and accountable channel for product training, service and support for TIAC II technology that ESTIQ spent millions to develop. ESTIQ therefore brings this action for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, tortious interference with prospective business relations, unfair competition, and declaratory judgement.

## **PARTIES**

14. Plaintiff ESTIQ is a Delaware corporation with its principal place of business at 4383 N. Forestdale Drive, Park City, Utah 84098. ESTIQ is a medical aesthetics distribution and commercialization company focused on introducing aesthetic medical devices to the U.S. market.

15. Defendant Cartessa is a limited liability company organized under the laws of New York with its principal place of business at 175 Broadhollow Rd, Melville, New York 11747. Cartessa operates as a distributor and commercialization company within the medical aesthetics industry, marketing and distributing aesthetic medical devices and technologies throughout the United States.

16. Defendant El.En. is a foreign corporation organized under the laws of Italy with its principal place of business in Via Baldanzese, 17, 50041 Calenzano, Florence, Italy. El.En. is a global manufacturer and developer of medical and aesthetic laser and energy-based technologies, including the TIAC II.

## **JURISDICTION AND VENUE**

17. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). ESTIQ is a citizen of Delaware and Utah. El.En. S.p.A. is a foreign corporation organized under the laws

of Italy with its principal place of business in Italy. Upon information and belief, Cartessa is a citizen of New York because each of its members is a citizen of New York. Cartessa maintains its principal place of business in Melville, New York and conducts business throughout New York and the United States. The amount in controversy exceeds $75,000, exclusive of interest and costs.

18. This Court may exercise personal jurisdiction over El.En. because El.En. entered into an exclusive distribution relationship with ESTIQ for the United States market, agreed that the Agreement would be governed by New York law, and agreed in Section 32.1 that the parties may seek interim or provisional relief, including preliminary injunctions and attachments, in aid of arbitration from any court having jurisdiction. El.En.'s conduct at issue also concerns the United States distribution rights granted under the Agreement and Defendants' New York-based commercialization of ONDA PRO through Cartessa.

19. This Court may exercise personal jurisdiction over Cartessa because Cartessa is headquartered in New York, conducts business in New York, and, as alleged herein, has marketed, promoted, offered for sale, and distributed ONDA PROducts in competition with ESTIQ despite notice of ESTIQ's exclusive rights under the Agreement.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Cartessa resides in this District, Defendants are subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to ESTIQ's claims occurred in this District.

## FACTUAL BACKGROUND

### A. *The TIAC II Platform*

21. El.En. is an Italian manufacturer of medical and aesthetic device technologies. Through its DEKA brand and related affiliates, El.En. develops and markets energy-based devices

used by physicians, medical spas, and aesthetic practices, including the devices at issue in the instant action.

22. TIAC[1] II is a medical device manufactured by El.En. used for non-invasive tissue heating and massage. The device delivers 2.45 GHz radiofrequency ("RF") energy to heat tissue beneath the skin to elevate tissue temperature, while an integrated handpiece provides a mechanical massage. It is used for temporary pain relief, to treat muscle spasms, increase local circulation and to temporarily reduce the appearance of cellulite.

23. To sell a medical device in the United States, manufacturers must obtain authorization from the FDA. One common pathway is known as "510(k) clearance." Through that process, the FDA permits a device to be marketed if the manufacturer shows that the device is substantially equivalent to a device already lawfully on the market, known as a "predicate device."

24. El.En.'s first version of the device, TIAC I, received FDA 510(k) clearance number K183371, on December 3, 2019. El.En. later developed a higher-powered, 2.45 GHz version of the same device platform for the U.S. market called the TIAC II, for which it sought FDA clearance.

25. On October 15, 2021, the FDA granted 510(k) clearance number K211091 for TIAC II. In obtaining 510k clearance, El.En. relied on TIAC I as the predicate device. In other words, El.En. obtained authorization to market TIAC II in the United States by showing that TIAC II was substantially equivalent to TIAC I. TIAC II contained certain updates from TIAC I, including increased 2.45 GHz power and handpiece modifications. TIAC II also included a contact-quality monitoring system to monitor electrode contact during use. The FDA clearance for TIAC II was limited to body indications and did not include facial or submental indications.

26. In FDA filings, El.En. listed "bodyESTIQ" and "ONDA PRO" as proprietary

[1] "TIAC" is an acronym for the "Temporary Improvement in the Appearance of Cellulite."

names associated with the TIAC II device, cleared under 510(k) No. K211091.

27. bodyESTIQ, and ONDA PRO were therefore simply different commercial names for TIAC II. After FDA cleared TIAC II under 510(k) No. K211091, El.En. added each of these names to TIAC II's clearance, rather than seeking separate clearance for each device. FDA records therefore continued to identify K211091 as the governing clearance associated with these proprietary names.

28. In FDA regulatory practice, proprietary names, or trade names, are commonly used interchangeably to identify the commercial branding associated with a medical device. Such naming modifications may be submitted through the FDA's Unified Registration and Listing System ("FURLS") without altering the underlying device clearance itself.

29. Adding or changing a proprietary name through FURLS itself does not create a new FDA clearance or establish that the device is a new or technologically distinct product. FDA records show that, between February 24, 2025 and March 2026, bodyESTIQ and ONDA PRO appeared as proprietary names associated with TIAC II under K211091.

30. On April 2, 2026, the FDA issued clearance K260647 for a device identified as SPECCHIO. El.En. identified TIAC II, K211091, as the predicate device. In its submission, El.En. represented that SPECCHIO had the same indications for use as TIAC II and that its technical specifications fell within the range of TIAC II's specifications.

31. El.En.'s side-by-side comparison of SPECCHIO and TIAC II in this submission indicates that both devices have the use the same underlying technology, have the same maximum radio-frequency output power, radio-frequency operating mode and frequency, effective temperature, contact-quality monitoring system, and massage-handpiece material. El.En. characterized the differences between SPECCHIO and TIAC II—which include restyled exterior plastics, changes to the graphical user interface, modified handpiece shapes, and the addition of

a smaller 'Pocket Pro' handpiece—as “minor” changes.

32. The FDA accordingly determined that SPECCHIO was substantially equivalent to TIAC II for the proposed indications for use. Facial use, however, was not included in the FDA-cleared indications for either TIAC II or SPECCHIO. Thus, neither the addition of a smaller handpiece nor the separate clearance transformed SPECCHIO into a materially different technology or authorized Defendants to promote the device for facial use.

33. The operator manuals for bodyESTIQ and ONDA likewise confirm that the devices employ the same underlying energy technology. Although marketing materials may describe the technology using different terminology—referring to bodyESTIQ as utilizing “microwave” energy and ONDA or ONDA PRO as utilizing “radiofrequency” energy—those descriptions do not identify different technologies. The devices operate at the same 2.45 GHz frequency. Microwave energy at 2.45 GHz is a form of radiofrequency electromagnetic energy, and the use of different terminology does not change the underlying technology employed by the devices.

34. Thus, Defendants’ effort to distinguish bodyESTIQ from ONDA or ONDA PRO based on the labels “microwave” and “radiofrequency” elevates marketing terminology over the devices’ actual technical characteristics. The applicable operator manuals, together with El.En.’s regulatory submissions and technical specifications, demonstrate that the devices employ the same core 2.45 GHz energy technology. The manuals further show the devices’ internal components, operating parameters, and servicing requirements are identical.

**B. *El.En.’s Longstanding Relationship with ESTIQ***

35. ESTIQ’s commercial relationship with El.En. arose from Chris Cella’s longstanding work with El.En. and its affiliates in connection with the distribution of TIAC II technology in the United States.

36. Cella, ESTIQ's founder and Chief Executive Officer, began working with El.En. more than six years ago. Through that relationship, Cella developed substantial experience marketing and distributing TIAC II technology in the United States and worked closely with El.En. personnel to develop the U.S. market for that technology.

37. Based on Cella's experience and longstanding relationship with El.En., El.En. selected ESTIQ to serve as its exclusive U.S. distributor of TIAC II technology.

38. Exclusivity was the cornerstone of the parties' distribution relationship. ESTIQ agreed to invest substantial resources in developing the United States market in reliance on El.En.'s promise that ESTIQ would serve as the exclusive U.S. distributor of the covered TIAC II technology.

39. Throughout the parties' relationship, El.En. personnel used the various commercial names for TIAC II—including ONDA, ONDA Coolwaves, bodyESTIQ, and ONDA PRO—interchangeably, reinforcing the parties' understanding that devices sold under those names incorporated the same core technology. This was especially evident in the referrals El.En. made to ESTIQ for potential customers. David Valenti, an international area manager for El.En., periodically referred potential leads to Cella for customers interested in purchasing the TIAC II technology from an authorized distributor in the United States.

40. In the approximately forty referral communications that ESTIQ received from Mr. Valenti between November 2024 and October 2025, he used the various commercial names for TIAC II interchangeably. For instance, in one such referral email dated January 9, 2025, Mr. Valenti refers a customer looking for U.S. sellers of "ONDA Plus" to Cella, stating "Attached please find a new lead interested in #2 ONDAs." On March 24, 2025, Mr. Valenti forwarded another message from a potential customer "interested in ONDA," and attached an email from a customer asking about the "ONDA' with coolwave" machine. In another email, dated August 28,

2025, Mr. Valenti refers a lead to Cella who is interested in "ONDA," forwarding an email from a potential customer looking to purchase the "ONDA PRO." These communications made clear that El.En. and its personnel used names such as ONDA, ONDA Plus, ONDA PRO, and ONDA Coolwaves interchangeably when communicating with customers and referring leads to ESTIQ, reflecting El.En.'s own treatment of those names as commercial names for the same TIAC II product platform.

41. In February 2025, Cella founded ESTIQ, a medical-aesthetics distribution company focused on marketing, selling, training providers on, and supporting aesthetic medical device technologies in the United States, and El.En. and ESTIQ once again entered into a new exclusive distribution agreement.

**C. *The Exclusive Distribution Agreement***

42. On February 24, 2025, ESTIQ and El.En. executed the Exclusive Distribution Agreement (the "Agreement") granting ESTIQ exclusive rights to market, distribute, and sell the covered products within the United States. (Agreement, 1.1.3, 2.1). The Agreement expressly granted ESTIQ exclusivity over certain "Products," defined in Exhibit A of the Agreement as including the TIAC II. This exclusivity prohibited El.En from appointing another distributor or directly distributing the Products in the U.S. during the Agreement's term (Agreement 2.2). Notwithstanding the foregoing, nothing prevented El.En from engaging in the marketing, distribution or sale of products which did not incorporate the Product anywhere in the United States. (*Id.*).

43. ESTIQ's obligations under the Agreement were extensive and performance driven. ESTIQ was obligated to use best efforts to maximize sales, comply with good faith and fair dealing, adhering to all laws and the Company's ethical code, and avoid competing products. (*Id.*, 4.1-4.2). It was also obligated to regularly report sales data, forecasts, market trends, and

competitor activity to El.En. Under the Agreement, ESTIQ would place purchase orders by, *inter alia*, submitting the order in writing; setting forth a minimum quantity of products to be purchased, the applicable price, and requested delivery dates; and receiving written acceptance of the order from El.En. (Agreement, 8.1-8.3).

44. Under the Agreement, ESTIQ's payment obligations arose only upon notification by El.En. of an order's readiness for shipment and subsequent invoicing by El.En. (Agreement, Ex. E) (noting the purchase order, and El.En.'s acceptance thereof constitutes a "complete and exclusive statement of the terms of the contract between the parties," and further that 100% of payment is due upon El.En.'s "notice that the Products are ready to be shipped).

45. The Agreement identifies several circumstances that could constitute a default by ESTIQ, including ESTIQ's failure to meet minimum purchase requirements, non-payment of amounts overdue by 45 days, failure to perform contractual obligations, or misrepresentation or warranty breaches. (*Id.,* 10.3) Such events triggered remedies such as suspension of deliveries, indemnification exposure, or termination. (*Id*., 24.2.2). Termination of the Agreement could also occur if the distributor ESTIQ failed to cure a purchase shortfall after notice, or upon any uncured default within thirty (30) days. Exhibit C to the Agreement laid out minimum purchase requirements for ESTIQ prescribed by year of the contract. Specifically, in Year 1 (March 1, 2025 to February 28, 2026), ESTIQ was required to make a minimum purchase of forty (40) product units of TIAC II. (*Id.*, Ex. C) (*Id.*, Ex. D).

46. Further, the Agreement granted ESTIQ a non-exclusive, royalty-free license to use El.En.'s proprietary marks, as listed in the Exhibit B, in advertising and promotional materials for TIAC II. (*Id.* 23.2) Exhibit B identifies various permitted proprietary marks, including "Coolwaves," "TIAC II", and "ONDA."

47. The Agreement was governed by New York law. (*Id.*, 31.1). Further, Section 32.1 states that any controversy, dispute or claim arising out of or relating to the Agreement, or the breach, interpretation, or enforcement thereof, shall be settled by binding arbitration administered by the International Center for Dispute Resolution ("ICDR"), but permits the parties to seek interim or provisional relief, including but not limited to preliminary injunctions and attachments, in aid of arbitration by any court having jurisdiction thereof.

**D. *El.En. Breaches the Agreement***

48. Following execution of the Agreement, ESTIQ undertook substantial efforts to commercialize the TIAC II platform in the U.S. market. In reliance on its exclusive distribution rights, ESTIQ invested millions of dollars and devoted substantial time, personnel, and resources to building the U.S. market for the platform. Those efforts included creating the operational and marketing infrastructure needed for launch, developing the brand, cultivating relationships with physicians and industry leaders, educating and training providers, generating customer demand, and supporting the product through trade shows, digital media, and other promotional initiatives. Through these efforts, ESTIQ built not only the commercial infrastructure necessary to launch TIAC II, but also the provider-training, service, customer-support, and product-accountability systems necessary to support its responsible use in the United States.

49. El.En. was aware of ESTIQ's investment and efforts to commercialize TIAC II in the U.S. market. Throughout 2025, ESTIQ communicated with El.En. regarding branding, physician engagement, forecasting, shipment planning, provider education, sales expectations, and launch strategy. El.En. personnel acknowledged and encouraged those efforts.

50. During this period, ESTIQ also submitted purchase orders for the TIAC II, satisfying its Year 1 minimum purchase requirement under the Agreement. On March 12, 2025, ESTIQ submitted Purchase Order ("PO") No. 2007 for forty (40) bodyESTIQ units (a commercial

name for TIAC II), requesting a shipment schedule of twenty (20) units by August 28, 2025, and an additional twenty units by November 15, 2025.

51. On March 20, 2025, El.En confirmed the order by email. However, ESTIQ did not receive notice that the units ordered were ready to ship or any corresponding invoices from El.En.

52. On June 27, 2025, Mr. Valenti emailed Cella, asking for confirmation of the sales forecast for "ONDA" that ESTIQ had sent in 2024. Cella noted he expected no changes. Mr. Valenti replied, stating that "confirmation of [the] orders [was] in progress for ONDA PRO…with delivery of #20 systems at the end of August and #20 systems at half of November. In the half-yearly review of forecasts/orders/production, I confirmed these numbers and dates to production El.En." Cella responded by asking Mr. Valenti to "check with me before you begin production for the 20 units in August. I want to be 100% sure so you do not manufacture and I'm delayed to pay. I know that would not be good. Again, I see this a slight chance it could happen but I would rather communicate this to you, than not. Does that make sense?"'

53. Shortly thereafter, ESTIQ and El.En. confirmed the original PO. On October 17, 2025, Mr. Valenti wrote to Cella, stating "[A]ttached please find relevant order acknowledgement #2105/2025," which represented the first half of PO No. 20007, and attached a confirmation for 20 bodyESTIQ Units to be delivered in August.

54. On October 27, 2025, Cella emailed Mr. Valenti, again confirming the order and indicating that it expected imminent shipment of the units in December 2025.

55. Despite confirming ESTIQ's purchase orders and shipment expectations, El.En. did not manufacture, ship, or deliver the ordered bodyESTIQ units. El.En. also did not notify ESTIQ that any units were ready for shipment, issue invoices for the units, or provide the

contractual notice that would have triggered ESTIQ's payment obligation. Between October and December 2025, ESTIQ did not receive meaningful production updates, shipment confirmations, invoices, or delivery schedules for the ordered units.

56. In December 2025, Cella met with El.En.'s General Manager, Paolo Salvado, to address the overdue units under Purchase Order No. 20007, ESTIQ's commercialization progress, and a proposed clinical study intended to support expanded FDA-cleared indications for TIAC II. Before the Agreement was executed, Cella had committed to raise $1 million toward the study, and ESTIQ had obtained the necessary funding.

57. At that meeting, Salvado stated that there would be no clinical study, directed ESTIQ to use the funds for marketing, and instructed Cella to market TIAC II for fat reduction and skin tightening—even though those uses were not included in TIAC II's FDA-cleared indications. Salvado also demanded the immediate return of four TIAC II devices that El.En. had loaned to ESTIQ for clinical purposes and, when Cella raised the overdue purchase order, demanded that ESTIQ cancel it and submit a new order.

58. ESTIQ declined to promote TIAC II for uncleared uses and returned the four loaned devices. El.En.'s abrupt abandonment of the contemplated study, instruction to promote uncleared uses for TIAC II, and demand that ESTIQ cancel its confirmed purchase order were inconsistent with El.En.'s prior support for ESTIQ's regulatory-compliant launch of TIAC II devices in the United States.

59. In January 2026, ESTIQ received reports suggesting that ONDA devices were being marketed and used in the United States outside ESTIQ's authorized distribution channels, including reports that entities may have been importing ONDA devices from Korea and selling

them to medical spas in the Los Angeles area. ESTIQ identified multiple Los Angeles-area practices advertising or using ONDA or ONDA Coolwaves services and received reports that several medical spas had purchased or were using ONDA devices obtained outside ESTIQ's channels while believing the devices were legitimate. The unauthorized distribution also left providers and customers uncertain about who was responsible for training, warranty service, product complaints, and safety-related issues.

60. ESTIQ promptly informed El.En. that ONDA products were appearing in the United States outside of its own distribution channels and sought assistance in investigating the unauthorized devices. El.En. personnel advised ESTIQ that El.En. could assist only if ESTIQ obtained identifying information for the devices, including photographs of manufacturer labels and serial numbers and the locations where the devices were installed.

61. ESTIQ prepared notices advising purchasers that it was the exclusive U.S. distributor and service provider for ONDA devices and asked El.En. to confirm that it would enforce ESTIQ's exclusive rights and prevent further sales of ONDA products through unauthorized channels.

62. El.En. responded with a series of shifting and contradictory explanations. El.En. initially suggested that ONDA devices appearing in the United States may have come through unauthorized grey-market channels outside El.En.'s control. El.En. then attempted to justify the breach of ESTIQ's exclusivity rights by claiming that ESTIQ had failed to satisfy contractual minimum purchase requirements. El.En.'s claims were entirely pretextual: ESTIQ had submitted purchase orders for the required units, which El.En. clearly *acknowledged and confirmed*. El.En. never delivered the units, issued invoices, or gave notice that payment was due—if breach occurred, it was entirely on El.En.'s side.

63. In February 2026, ESTIQ representatives traveled to Italy and met with El.En.

personnel to discuss the parties' commercial relationship, outstanding purchase orders, and reports that ONDA and ONDA PRO devices were appearing in the United States outside of ESTIQ's exclusive distribution channels. During that meeting, El.En. acknowledged that ONDA PRO devices had been brought into the United States for one-off promotional events involving celebrities in the Los Angeles area without ESTIQ's knowledge but asserted for the first time that the ONDA PRO fell outside the definition of "Products" under the Agreement, and that bodyESTIQ was the only product expressly covered by the Agreement. That position was inconsistent with El.En.'s prior conduct and regulatory filings: El.En. personnel had used bodyESTIQ, ONDA, and ONDA PRO interchangeably in referrals and communications with ESTIQ as well as prospective customers, and El.En. had listed ONDA PRO as a proprietary name for TIAC II under TIAC II's existing 510(k) clearance.

64. Shortly after the meeting in Italy, ESTIQ sought clarity from El.En. about the production status and delivery timeline for the units it had ordered in March 2025. El.En. disputed ESTIQ's account and claimed that ESTIQ had failed to make required payments, failed to confirm readiness to accept delivery, and indicated that it did not yet need the units because it had sufficient inventory. El.En. also claimed that ESTIQ had failed to provide clear forecasts or pickup plans, causing El.En. to reallocate the units to other customers.

65. On February 11, 2026, El.En. acknowledged by email that there had been a "misunderstanding" over ESTIQ's purchase order. It blamed ESTIQ for placing the orders—which El.En. itself had twice confirmed--"on hold," thereby disrupting El.En.'s production schedule. El.En. further claimed that the units allocated to ESTIQ under the Agreement had been reassigned to other customers due to high global demand and asserted that ESTIQ had failed to provide a "go-ahead" for additional production–even though ESTIQ was never notified that the

goods were ready for shipment and received no invoices.

66. On February 24, 2026, Salvado of El.En. suggested in an email to ESTIQ that certain ONDA devices appearing in the United States may have been grey-market or counterfeit devices outside El.En.'s control. A few days later, however, El.En. shifted positions and asserted that ESTIQ had failed to satisfy the Agreement's minimum purchase requirements because ESTIQ had not paid for forty units by February 28, 2026. El.En.'s minimum-purchase theory was pretextual. As noted above, ESTIQ had submitted purchase orders for the required units, El.En. had acknowledged and confirmed those orders, and El.En. had never notified ESTIQ that the units were ready for shipment, issued invoices, or otherwise triggered ESTIQ's payment obligation under the Agreement.

67. El.En. then stated that it would continue the relationship only if ESTIQ cancelled its 2025 purchase order (the same order which it claimed El.En. had not confirmed) and submitted a new 2026 order with revised delivery dates.

68. El.En. further demanded ESTIQ sign a proposed Addendum to the Agreement. The Addendum sought to retroactively narrow the scope of exclusivity rights under the Agreement solely to devices marketed under the bodyESTIQ name, and not ONDA or ONDA PRO. In a section of the Addendum entitled "Clarification on the Scope of Exclusivity," El.En. asked ESTIQ to acknowledge and confirm that the bodyESTIQ system constituted the only "Product" contemplated under the Agreement and that ONDA PRO and other products, models, versions, evolutions or variants were expressly excluded. (Addendum, 3.2). Thus, while El.En. framed the Addendum as a "clarification" of the original Agreement, it materially altered the commercial understanding of the terms of that Agreement between the parties by narrowing the scope of the exclusivity ESTIQ believed it had been granted under the original Agreement.

69. ESTIQ appropriately refused to sign the Addendum. By email to El.En. on March 4, 2026, ESTIQ requested confirmation that El.En. honor the Agreement's exclusivity provisions as written and explained that ESTIQ's commercial investment—including marketing, key opinion leader relationships, customer development, and purchase commitments—was predicated on those exclusive rights. ESTIQ also disputed El.En.'s characterization of its alleged non-performance and reiterated that ESTIQ had submitted and reaffirmed purchase orders for forty units that El.En. failed to manufacture or deliver. ESTIQ further objected that the proposed Addendum improperly attempted to narrow ESTIQ's exclusivity by allowing El.En. to commercialize ONDA, ONDA PRO, and related products based on the same technological platform and regulatory clearance. ESTIQ refused to cancel its 2025 purchase order, submit new purchase orders, or sign any addendum narrowing its exclusivity unless El.En. first confirmed that it would honor the existing exclusivity terms of the Agreement. El.En. refused to provide that confirmation and maintained its position that ESTIQ was in breach of the Agreement.

70. In April 2026, ESTIQ learned that El.En. had obtained FDA clearance K260647 for a device identified in the FDA submission as "SPECCHIO." In seeking that clearance, El.En. identified TIAC II, cleared under K211091, as the predicate device and represented in FDA filings that SPECCHIO had the same indications for use and materially the same core technology as TIAC II.

71. Specifically, El.En.'s side-by-side comparison of SPECCHIO and TIAC II in regulatory filings indicate that the two devices share the same device technology, maximum radio-frequency output power, radio-frequency operating mode, radio-frequency output frequency, effective treatment temperature, contact-quality monitoring system, and massage-handpiece material. El.En. characterized the differences as limited to restyled exterior plastics, changes to the graphical user interface, modifications to the shape of the handpieces, and the addition of a

smaller third handpiece known as the "Pocket Pro." El.En. further represented that those changes were minor and that SPECCHIO's technical specifications remained within the range of TIAC II.

72. The FDA thereafter cleared SPECCHIO under 510(k) number K260647, determining that SPECCHIO was "substantially equivalent"[2] to TIAC II.[3]

73. After K260647 issued, El.En. removed ONDA PRO as a proprietary name associated with TIAC II under K211091 and registered ONDA PRO instead as a proprietary name associated with SPECCHIO under K260647. Upon information and belief, El.En. and Cartessa then began marketing the SPECCHIO-cleared device in the United States under the commercial name ONDA PRO.

74. In short, this chronology reveals a transparent rebranding scheme—not the creation of a new product. El.En. first listed ONDA PRO as a proprietary name for TIAC II, then obtained a separate 510(k) clearance for SPECCHIO by representing to the FDA that it had the same intended use and materially the same technology as TIAC II. El.En. then simply reassigned the ONDA PRO brand from TIAC II to SPECCHIO, even though *its own FDA submissions* showed the devices to be materially the same.

**E. *Cartessa's ONDA PRO Launch and Resulting Market Confusion***

75. In March 2026, ESTIQ learned that Cartessa Aesthetics, a direct competitor,

[2] According to FDA guidance, a "Substantially Equivalent" decision indicates the device: "has the same intended use as the predicate; and has the same technological characteristics as the predicate; or has the same intended use as the predicate; and has different technological characteristics and does not raise different questions of safety and effectiveness; and the information submitted to FDA demonstrates that the device is as safe and effective as the legally marketed device." FDA, Premarket Notification 510(k) | FDA (Aug. 22, 2024). "A claim of substantial equivalence does not mean the new and predicate devices needs to be identical. FDA first establishes that the new and predicate devices have the same intended use and any differences in technological characteristics do not raise different questions of safety and effectiveness." *Id.*

[3] *See id.*; *see also* National Institute of Health AccessGUDID, "Device ONDA PRO (08034108513270" (https://accessgudid.nlm.nih.gov/devices/08034108513270) (associating ONDA PRO's FDA 510(k) number K260647, with the 510(k) number of TIAC II, K211091).

intended to begin distributing ONDA PRO in the United States.

76. On April 29, 2026, a press release announced that ONDA PRO by El.En. was expanding its Coolwaves technology into the United States and Canadian markets through Cartessa. The press release described ONDA PRO as the "newest, improved generation of 2.45 GHz Coolwaves" technology. That same day, Cartessa also sent an email announcing that ONDA PRO was available for purchase in the United States and North America. Cartessa also promoted ONDA PRO through social media posts and marketing communications stating that Cartessa was the exclusive distributor for ONDA PRO in the United States and Canada.

77. Cartessa's launch materials positioned ONDA PRO as a superior or next-generation version of the same ONDA/Coolwaves technology that ESTIQ had been commercializing under the bodyESTIQ name. Cartessa also advertised features, including facial use, which has led existing and prospective ESTIQ customers to question whether bodyESTIQ had been replaced, downgraded, or superseded. Cartessa's conduct caused confusion in the market, disrupted ESTIQ's customer relationships, and caused certain prospective customers to delay or decline purchases from ESTIQ.

78. Upon information and belief, Cartessa has also directly contacted ESTIQ customers and prospective customers regarding ONDA PRO. In those communications, Cartessa promoted ONDA PRO as the manufacturer-supported ONDA PROduct for the United States market and encouraged customers to purchase ONDA PRO or upgrade from bodyESTIQ to ONDA PRO.

79. Upon information and belief, Cartessa's conduct has caused confusion among physicians, medical spas, aesthetic practices, and existing and prospective ESTIQ customers, including but not limited to, [redacted], and others, regarding who was authorized to sell and support ONDA technology in the United States. ESTIQ

has received questions from existing customers about whether ESTIQ is still an authorized distributor of the TIAC II technology, whether bodyESTIQ is an authentic ONDA device, whether ESTIQ can provide warranty service and support, and whether ONDA PRO has replaced bodyESTIQ. This confusion was particularly significant given that TIAC II is a medical device. Providers and customers have been left uncertain as to which entity—Cartessa or ESTIQ—is authorized and responsible for training, warranty service, maintenance, adverse-event reporting, and other product-related concerns.

80. Cartessa's conduct has also interfered with ESTIQ's prospective sales. Prospective customers delayed or declined bodyESTIQ purchases after learning of Cartessa's ONDA PRO launch, including because Cartessa promoted ONDA PRO as the newest generation of ONDA/Coolwaves technology and as available through Cartessa in the United States and Canada.

81. Cartessa's launch further impaired ESTIQ's pricing integrity. Prospective customers have used Cartessa's ONDA PRO launch and marketing claims as leverage in negotiations with ESTIQ, forcing ESTIQ to discount bodyESTIQ devices to preserve sales opportunities and limit further customer attrition.

82. Further, upon information and belief, El.En. has used its own public-facing social media channels to promote Cartessa as the exclusive United States distributor for ONDA PRO. El.En.'s posts amplified Cartessa's launch, reinforced Cartessa's claimed exclusivity, and further contributed to market confusion regarding ESTIQ's continuing exclusive rights to distribute the TIAC II technology in the United States.

83. Cartessa's launch, together with El.En.'s public support for Cartessa, undermined ESTIQ's commercialization strategy and the controlled distribution channel ESTIQ had developed to provide consistent training, service, warranty support, and customer

accountability for TIAC II technology in the United States.

84. In April 2026, in light of the foregoing, ESTIQ sent El.En. a notice of breach and a cease-and-desist letter to Cartessa. In response to the cease-and-desist, Cartessa did not provide assurances that it would cease its infringing conduct. Instead, El.En. refused to acknowledge that any breach had occurred and instead reiterated that ESTIQ failed to satisfy the Agreement's minimum purchase requirements for Year 1, notwithstanding that El.En.'s own October 2025 communications had confirmed ESTIQ's purchase order and expected shipment schedule. El.En. also asserted once again that Section 1.1.1.2 of the Agreement did not encompass ONDA PRO. It stated that "Products" were defined in the Agreement as "the products listed in Exhibit A, as currently manufactured by the Company," and provided that "future models and variants thereto may be included by the Company at its sole discretion." El.En. took the position that ONDA PRO was a future model or variant that El.En. had not elected to include within ESTIQ's exclusive distribution rights.

85. El.En.'s reliance on Section 1.1.1.2 is misplaced. ESTIQ does not allege merely that ONDA PRO is a newly developed "future model or variant" that El.En. was required to add to the Agreement. Before this dispute arose—and before El.En. obtained a separate clearance for ONDA PRO—El.En. had already listed ONDA PRO as a proprietary name for TIAC II under TIAC II's existing 510(k) clearance, used ONDA PRO interchangeably with TIAC II and other commercial names in customer referrals, and treated ONDA PRO as part of the same TIAC II product platform. Those facts support ESTIQ's position that ONDA PRO was already a commercial name associated with the covered TIAC II Product, not a distinct future model whose inclusion depended solely on a later discretionary election by El.En.

86. El.En.'s interpretation also cannot be reconciled with the Agreement as a whole.

Exhibit A identifies TIAC II as a covered Product; Exhibit B expressly identifies "ONDA" as a proprietary mark associated with that Product; and Section 2.2 prohibits El.En. from distributing the covered Product through competing channels. Reading Section 1.1.1.2 to permit El.En. unilaterally to remove a covered product from ESTIQ's exclusivity merely by changing its commercial name would render the exclusivity grant illusory and defeat the Agreement's central commercial purpose. At a minimum, the Agreement does not clearly grant El.En. discretion to reclassify an existing covered Product as a supposedly new model or variant after ESTIQ invested millions of dollars in reliance on its exclusive rights.

87. In its response to ESTIQ's breach of notice letter, El.En. further demanded that ESTIQ withdraw its cease-and-desist letter to Cartessa and submit a new purchase order for the Product as a condition of moving forward with the relationship. El.En.'s response confirmed that it would not honor ESTIQ's exclusive rights as ESTIQ understood them and that El.En. intended to proceed with Cartessa's distribution of ONDA PRO notwithstanding ESTIQ's objections.

88. As a result of Defendants' conduct, ESTIQ has suffered and will continue to suffer harm to its customer relationships, goodwill, sales pipeline, pricing integrity, physician and key opinion leader relationships, and launch momentum in the United States. Defendants' conduct has also fragmented the accountable distribution structure necessary for the proper training, servicing, and support of a regulated medical device. That harm cannot be fully remedied by monetary damages alone.

89. Defendants' conduct also creates regulatory and patient-safety concerns that cannot be repaired through a later damages award. Cartessa has promoted facial-use capabilities even though facial use is not included in the FDA-cleared indications for TIAC II or SPECCHIO. At the same time, Defendants have fragmented responsibility for provider training, servicing,

warranty support, product complaints, and adverse-event reporting, undermining the controlled and accountable distribution infrastructure for TIAC II technology ESTIQ spent millions building in the United States.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT (Against El.En.)

90. ESTIQ realleges and incorporates by reference Paragraphs 1 through 73 as though fully set forth herein.

91. On February 24, 2025, ESTIQ and El.En. entered into the Exclusive Distribution Agreement. The Agreement is a valid and enforceable contract.

92. Under the Agreement, El.En. granted ESTIQ the exclusive right to market, sell, and distribute the covered "Products" in the United States. The Agreement identifies TIAC II as a covered Product and grants ESTIQ rights to use associated proprietary marks, including "ONDA," in advertising and promotional materials for TIAC II.

93. The Agreement barred El.En., during the term of the Agreement and so long as ESTIQ was not in default, from appointing another distributor for the covered Products or directly distributing those Products in the United States. The Agreement further provided that purchase orders would be placed in writing, identify the quantity, price, and requested delivery dates, and become binding upon El.En.'s written acceptance.

94. ESTIQ performed its obligations under the Agreement. In March 2025, ESTIQ submitted purchase orders for forty bodyESTIQ units, a commercial name for TIAC II, satisfying ESTIQ's Year 1 minimum purchase requirement under Exhibit C of the Agreement. ESTIQ requested that twenty units be shipped by August 28, 2025, and an additional twenty units be shipped by November 15, 2025, for a total purchase price of $1,174,000.

95. El.En. accepted and repeatedly confirmed those orders. El.En. confirmed the order by email on March 20, 2025. On June 27, 2025, El.En. confirmed that the orders were in progress for delivery of twenty systems at the end of August and twenty systems in mid-November. On October 17, 2025, El.En. sent ESTIQ an order acknowledgement for the first twenty bodyESTIQ units. On October 27, 2025, ESTIQ again confirmed its expectation that shipment would proceed.

96. El.En. nevertheless failed to manufacture, ship, invoice, or deliver the ordered units. El.En. also failed to notify ESTIQ that any units were ready for shipment, which was the contractual event that would have triggered ESTIQ's payment obligation. El.En. then admitted that units allocated to ESTIQ had been reallocated to other customers due to purported global demand.

97. El.En. further breached the Agreement by refusing to fulfill ESTIQ's confirmed purchase order, demanding that ESTIQ cancel the order and submit a replacement order, and invoking the resulting nonpayment as a purported default even though El.En. never issued the required readiness notice or invoice.

98. El.En.'s assertion that ESTIQ failed to satisfy the Agreement's minimum purchase requirements is meritless and pretextual. ESTIQ submitted purchase orders for the required units, El.En. accepted and confirmed those orders, and El.En. never delivered the units, issued invoices, or provided notice that the units were ready to ship. El.En. has no right to rely on its own failure to supply the ordered Products as a basis to claim default, terminate the relationship, narrow ESTIQ's exclusive rights, or excuse El.En.'s own nonperformance.

99. El.En. further breached the Agreement by authorizing, facilitating, permitting, or supporting the marketing, sale, and distribution of the same TIAC II technology in the United

States through channels other than ESTIQ, including through Cartessa, ESTIQ's direct competitor.

100. El.En. has attempted to justify that conduct by asserting that ONDA, ONDA PRO, and bodyESTIQ are separate products outside the scope of ESTIQ's exclusivity. That position contradicts the Agreement, the parties' course of dealing, El.En.'s own communications, and the commercial and regulatory reality of the products. El.En. personnel repeatedly used the names TIAC II, ONDA, ONDA Plus, ONDA Coolwaves, bodyESTIQ, and ONDA PRO interchangeably when communicating with ESTIQ and prospective customers, reflecting El.En.'s treatment of those names as commercial names for the same TIAC II product platform. Consistent with that treatment, El.En.'s regulatory filings listed ONDA PRO as a proprietary name associated with TIAC II under 510(k) No. K211091, rather than as a separate product subject to a distinct clearance.

101. El.En.'s proposed Addendum confirms that El.En. understood the existing Agreement covered more than the narrow scope El.En. later claimed. Through the proposed Addendum, El.En. sought to limit ESTIQ's exclusivity to devices branded bodyESTIQ while expressly excluding ONDA PRO and other products, models, versions, evolutions, or variants. Had the Agreement already excluded those products, no such modification would have been necessary.

102. El.En. had no right to preserve ESTIQ's exclusivity in name only while selling the same device, built on the same underlying technology, under different commercial names. That conduct defeated the commercial purpose of the Agreement and deprived ESTIQ of the benefit of its bargain.

103. El.En.'s breaches have caused and will continue to cause ESTIQ substantial harm, including loss of the exclusivity for which it bargained, loss of sales opportunities, market

confusion, pricing pressure, disruption of customer and physician relationships, damage to goodwill, and loss of the benefit of ESTIQ's substantial investment in commercializing the TIAC II platform in the United States.

104. ESTIQ is entitled to (i) specific performance of El.En.'s obligations under the Agreement, (ii) temporary, preliminary, and permanent injunctive relief restraining El.En. from violating ESTIQ's exclusive rights, and (iii) damages in an amount to be determined at trial.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against El.En.)

105. ESTIQ realleges and incorporates by reference Paragraphs 1 through 87 as though fully set forth herein.

106. The Agreement is a valid and enforceable contract. Under Sections 3.1 and 3.2 of the Agreement, the parties expressly agreed to act in accordance with principles of good faith and fair dealing in performing their contractual obligations and interpreting the Agreement. In addition, New York law implies in every contract a covenant of good faith and fair dealing, which prohibits a party from acting in a manner that destroys or injures the other party's right to receive the benefits of the contract.

107. ESTIQ performed its obligations under the Agreement, including by submitting purchase orders for forty bodyESTIQ units sufficient to satisfy its Year 1 minimum purchase requirement, investing substantial resources to commercialize the TIAC II platform in the United States, developing physician and key opinion leader relationships, building sales and marketing infrastructure, and preparing the product for launch in reliance on El.En.'s promise of exclusivity.

108. El.En. breached the implied covenant of good faith and fair dealing by acting to deprive ESTIQ of the central benefit of the Agreement: exclusive United States distribution

rights for the TIAC II platform. El.En. accepted the benefit of ESTIQ's investment and market-development efforts but then sought to redirect the same underlying technology through competing channels, including Cartessa, while claiming that ESTIQ's exclusivity did not apply because the same product platform was being sold under different commercial names.

109. El.En.'s position was not a good-faith interpretation of the Agreement. ESTIQ reasonably understood—and the parties' course of dealing confirmed—that ESTIQ's exclusivity applied to the TIAC II platform regardless of later branding variations. The Agreement identified "ONDA" as a proprietary mark associated with TIAC II, and El.En. personnel repeatedly used names such as TIAC II, ONDA, ONDA Plus, ONDA Coolwaves, bodyESTIQ, and ONDA PRO interchangeably in communications with ESTIQ and prospective customers.

110. El.En.'s proposed Addendum further demonstrates El.En.'s bad faith. After ESTIQ objected to El.En.'s treatment of ONDA and ONDA PRO as outside the Agreement, El.En. proposed an Addendum that would have retroactively narrowed ESTIQ's exclusivity to devices branded bodyESTIQ and expressly excluded ONDA PRO and other products, models, versions, evolutions, or variants. By seeking ESTIQ's agreement to exclude those products, El.En. effectively acknowledged that the existing Agreement did not already exclude them.

111. El.En. also acted in bad faith by withholding performance on ESTIQ's confirmed purchase orders and then invoking ESTIQ's supposed nonpayment as a basis to claim default. El.En. repeatedly acknowledged and confirmed ESTIQ's orders, failed to manufacture or deliver the ordered units, failed to notify ESTIQ that the units were ready for shipment, failed to issue invoices, and then asserted that ESTIQ had not satisfied the Agreement's minimum purchase requirements. El.En. cannot fairly rely on a payment obligation that El.En.'s own inaction never triggered.

112. El.En. compounded that bad faith by abandoning the contemplated clinical

study after ESTIQ raised $1 million toward it, directing ESTIQ to promote uncleared uses instead, and later purporting to rescind ESTIQ's right to use the ONDA mark while supporting Cartessa's competing ONDA PRO launch. Those actions were calculated to deprive ESTIQ of the regulatory-compliant launch strategy, branding rights, and market position for which it bargained.

113. El.En.'s conduct had the effect of rewriting the Agreement after ESTIQ had already invested millions of dollars in reliance on El.En.'s exclusivity promise. Under El.En.'s newly advanced interpretation, ESTIQ's exclusivity would be meaningless because El.En. could avoid that exclusivity simply by selling the same device, built on the same underlying technology, under a different commercial name. That result would defeat the Agreement's commercial purpose and deprive ESTIQ of the bargain it struck.

114. El.En.'s efforts to render ESTIQ's bargained-for exclusivity under the Agreement meaningless are made clear by its transparent reassignment of the ONDA PRO brand. El.En. initially listed ONDA PRO as a proprietary name for TIAC II under 510(k) No. K211091. It then obtained a separate clearance for SPECCHIO under K260647 by identifying TIAC II as the predicate device and representing that SPECCHIO had the same intended use and materially the same core technology. After K260647 issued, El.En. removed ONDA PRO from TIAC II's listing and, upon information and belief, began marketing SPECCHIO through Cartessa under the ONDA PRO name. El.En. cannot evade ESTIQ's exclusive distribution rights by shifting a commercial name between substantially equivalent devices. Under El.En.'s interpretation, it could nullify ESTIQ's exclusivity at will simply by relabeling the same core technology and selling it through another distributor.

115. El.En.'s conduct destroyed or injured ESTIQ's right to receive the fruits of the Agreement, including the benefit of exclusive United States distribution rights, market-development protection, customer goodwill, physician relationships, sales opportunities, pricing

integrity, and launch momentum.

116. As a direct and proximate result of El.En.'s breach of the implied covenant of good faith and fair dealing, ESTIQ has suffered and continues to suffer damages, including loss of exclusivity, loss of market share, loss of customer goodwill, lost business opportunities, disruption to physician and customer relationships, pricing pressure, and impairment of the substantial investments ESTIQ made to commercialize the TIAC II platform in the United States.

117. ESTIQ is entitled to compensatory damages in an amount to be determined at trial, together with temporary, preliminary, and permanent injunctive relief restraining El.En. from further conduct that deprives ESTIQ of the benefits of the Agreement.

## COUNT III: TORTIOUS INTERFERENCE WITH CONTRACT

**(Against Cartessa)**

118. ESTIQ realleges and incorporates by reference Paragraphs 1 through 99 as though fully set forth herein.

119. ESTIQ and El.En. entered into a valid and enforceable Agreement granting ESTIQ exclusive rights to market, sell, and distribute the TIAC II platform in the United States. As alleged above, El.En. breached the Agreement by authorizing, facilitating, permitting, and supporting the distribution and commercialization of the same TIAC II technology in the United States through channels other than ESTIQ, including through Cartessa.

120. Cartessa is not a party to the Agreement but knew of ESTIQ's contractual rights no later than April 22, 2026, when ESTIQ sent Cartessa written notice of ESTIQ's exclusive rights under the Agreement. That correspondence notified Cartessa that ESTIQ held exclusive United States distribution rights for the TIAC II technology and demanded that Cartessa cease conduct inconsistent with those rights.

121. Despite that notice, Cartessa intentionally induced, encouraged, and

participated in El.En.'s breach of the Agreement. Cartessa accepted and promoted distribution rights for ONDA PRO in the United States, marketed itself as the exclusive distributor for ONDA PRO in the United States and Canada, promoted ONDA PRO as the manufacturer-supported ONDA PROduct for the United States market, and solicited existing and prospective ESTIQ customers.

122. Cartessa's conduct was intentional, improper, and without justification. Cartessa knew that ESTIQ claimed exclusive rights to distribute the TIAC II technology in the United States, yet proceeded to commercialize ONDA PRO in direct conflict with those rights in a manner that benefited from ESTIQ's prior commercialization efforts.

123. Cartessa's conduct caused and furthered El.En.'s breach of the Agreement by enabling El.En. to distribute and commercialize the TIAC II technology in the United States outside ESTIQ's exclusive channels. Cartessa's conduct also deprived ESTIQ of the benefits of the Agreement, including the exclusivity, customer relationships, pricing integrity, market position, goodwill, and launch momentum for which ESTIQ bargained.

124. As a direct and proximate result of Cartessa's tortious interference with the Agreement, ESTIQ has suffered and continues to suffer substantial damages, including loss of its bargained-for exclusivity, loss of market share, loss of customer goodwill, disruption of physician and customer relationships, pricing pressure, diverted sales opportunities, and impairment of the substantial investments ESTIQ made to commercialize the TIAC II platform in the United States.

125. Cartessa's continued marketing, sale, and distribution of ONDA PRO threatens to permanently impair ESTIQ's market position and further confuse providers and customers about which distributor is the authorized source for training, service, and warranty support for TIAC II technology in the United States. Those injuries cannot be fully remedied through monetary damages alone.

126. Cartessa's promotion of ONDA PRO for facial use was particularly misleading and harmful because facial use is not included in the FDA-cleared indications for either TIAC II or SPECCHIO. By presenting an uncleared use as a differentiating feature of the supposedly "next-generation" product, Cartessa intensified customer confusion and placed ESTIQ at a competitive disadvantage for adhering to a regulatory-compliant commercialization strategy.

127. ESTIQ is entitled to compensatory damages in an amount to be determined at trial, together with temporary, preliminary, and permanent injunctive relief restraining Cartessa from further interfering with ESTIQ's contractual rights under the Agreement.

**COUNT IV: UNFAIR COMPETITION CLAIM (Against Cartessa)**

128. ESTIQ realleges and incorporates by reference Paragraphs 1 through 108 as though fully set forth herein.

129. Cartessa misappropriated the results of ESTIQ's skill, expenditures, and labor. ESTIQ invested substantial time, money, labor, and commercial effort to develop the United States market for the TIAC II platform. Those efforts included building physician and key opinion leader relationships, developing provider-facing marketing materials, creating sales and onboarding infrastructure, training providers, educating customers, generating market demand, and promoting the bodyESTIQ technology in reliance on ESTIQ's exclusive distribution rights.

130. Through those efforts, ESTIQ created valuable commercial advantages in the United States market, including customer awareness, physician credibility, provider relationships, sales momentum, goodwill, and demand for the TIAC II platform.

131. Cartessa knew of ESTIQ's claimed exclusive rights no later than April 22, 2026, when ESTIQ sent Cartessa written notice of ESTIQ's rights under the Agreement. Despite that notice, Cartessa proceeded to market, promote, and commercialize ONDA PRO in the United

States and Canada, including by representing itself as the exclusive distributor for ONDA PRO.

132. Upon information and belief, Cartessa now seeks to capitalize on those efforts by distributing and commercializing the same underlying TIAC II platform—including ONDA and ONDA PRO devices—through competing channels after ESTIQ had already established the market for those products.

133. Cartessa's conduct constitutes unfair competition under New York common law because Cartessa, in bad faith, sought to misappropriate and exploit the benefit of ESTIQ's market-building efforts, customer education, physician relationships, goodwill, and demand-generation work. Rather than building an independent market for a separate product, Cartessa sought to capitalize on the market ESTIQ had developed for the same TIAC II technology.

134. Cartessa's conduct also caused marketplace confusion regarding the authorized source for ONDA technology in the United States. Cartessa's marketing led existing and prospective customers to question whether ESTIQ remained an authorized distributor, whether bodyESTIQ was an authentic ONDA device, whether ONDA PRO had replaced bodyESTIQ, and whether Cartessa—not ESTIQ—was the manufacturer-supported source for ONDA technology in the United States.

135. Cartessa's conduct was undertaken in bad faith and without justification. Cartessa proceeded despite notice of ESTIQ's exclusive rights, promoted itself as the exclusive distributor for ONDA PRO, solicited existing and prospective ESTIQ customers, and used El.En.'s launch of ONDA PRO to benefit from demand, goodwill, and customer relationships created by ESTIQ's substantial investment.

136. As a direct and proximate result of Cartessa's unfair competition, ESTIQ has suffered and continues to suffer damages, including lost sales opportunities, pricing pressure, loss of customer goodwill, disruption of physician and customer relationships, market confusion,

impairment of launch momentum, and loss of the benefit of ESTIQ's substantial commercialization investment.

137. ESTIQ is entitled to compensatory damages in an amount to be determined at trial, disgorgement of Cartessa's ill-gotten gains, and temporary, preliminary, and permanent injunctive relief restraining Cartessa from further unfairly competing with ESTIQ, including by marketing, selling, distributing, or representing itself as the exclusive United States distributor for ONDA PRO or any TIAC II product in derogation of ESTIQ's rights.

## **COUNT V: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (Against El.En. and Cartessa)**

138. ESTIQ realleges and incorporates by reference Paragraphs 1 through 118 as though fully set forth herein.

139. ESTIQ had existing and prospective business relationships with physicians, medical spas, aesthetic practices, providers, and customers, [redacted], and others, interested in purchasing TIAC II technology in the United States. Those relationships included customers and prospective customers referred to ESTIQ by El.En. personnel beginning in November 2024, leads developed through ESTIQ's sales and marketing efforts, and providers with whom ESTIQ developed relationships through its own efforts to commercialize TIAC II in the United States.

140. Those relationships arose directly from ESTIQ's exclusive United States distribution rights under the Agreement. Under the Agreement, ESTIQ held exclusive rights to market, sell, and distribute the covered Products, including TIAC II, in the United States during the term of the Agreement. The Agreement barred El.En. from appointing another distributor or directly distributing the covered Products in the United States.

141. Defendants knew of ESTIQ's existing and prospective business relationships. El.En. knew of those relationships because it referred prospective customers to ESTIQ, communicated with ESTIQ regarding sales forecasts, branding, launch strategy, provider education, and shipment planning, and understood that ESTIQ was developing the United States market in reliance on its exclusive distribution rights.

142. Cartessa knew of ESTIQ's claimed exclusive rights and customer relationships no later than April 22, 2026, when ESTIQ sent Cartessa written notice of ESTIQ's rights under the Agreement. Despite that notice, Cartessa failed to provide assurances that it would refrain from distributing or commercializing ONDA or ONDA PRO devices in the United States.

143. Defendants intentionally interfered with ESTIQ's existing and prospective business relationships. El.En. authorized, facilitated, permitted, and publicly supported the commercialization of ONDA PRO in the United States through Cartessa, including by promoting Cartessa as the exclusive United States distributor for ONDA PRO. El.En. also permitted ONDA and ONDA PRO devices to appear in the United States outside ESTIQ's authorized channels, including through foreign distribution channels and later through Cartessa, ESTIQ's direct competitor. Defendants' conduct was not ordinary competition. It disrupted the exclusive distribution structure established for a regulated medical device and obscured responsibility for provider training, service, warranty support, and product-related accountability.

144. Cartessa likewise interfered with ESTIQ's business relationships by marketing itself as the exclusive distributor for ONDA PRO in the United States and Canada, promoting ONDA PRO as the manufacturer-supported ONDA PROduct for the United States market, directly contacting ESTIQ customers and prospective customers, and encouraging customers to purchase ONDA PRO or upgrade from bodyESTIQ to ONDA PRO.

145. Cartessa also advertised ONDA PRO as a superior or next-generation device, including by promoting facial-use capabilities that caused customers to question whether bodyESTIQ had been replaced, downgraded, or superseded. Cartessa's statements that ONDA PRO was "Exclusive to Cartessa Aesthetics in the U.S. and Canada" further created the false impression that Cartessa—not ESTIQ—was the authorized source for ONDA technology in the United States.

146. Defendants' interference was wrongful and without justification. Defendants acted despite notice of ESTIQ's exclusive rights, used misleading exclusivity claims to suggest that Cartessa—not ESTIQ—was the authorized source for ONDA technology in the United States, and caused confusion among customers and prospective customers regarding whether ESTIQ remained authorized to sell and support the TIAC II platform. Defendants' conduct was not ordinary competition. Rather, it was a coordinated effort to divert business from ESTIQ by undermining the exclusivity, goodwill, customer confidence, and market position ESTIQ had built.

147. Defendants' conduct interfered with identifiable customer and prospective customer relationships. Existing and prospective ESTIQ customers questioned whether ESTIQ remained an authorized distributor, whether bodyESTIQ was an authentic ONDA device, whether ESTIQ could provide warranty service and support, whether ONDA PRO had replaced bodyESTIQ, and whether Cartessa had become the exclusive manufacturer-supported source for ONDA technology in the United States. Certain customers delayed or declined purchases from ESTIQ, and others used Cartessa's ONDA PRO launch and marketing claims as leverage to demand discounts from ESTIQ.

148. But for Defendants' wrongful interference, ESTIQ would have continued to

pursue and close sales with existing and prospective customers for the TIAC II/bodyESTIQ platform, maintain its pricing integrity, and preserve the customer and physician relationships it developed in reliance on its exclusive rights.

149. As a direct and proximate result of Defendants' tortious interference with ESTIQ's prospective economic advantage, ESTIQ has suffered and continues to suffer damages, including lost sales opportunities, pricing pressure, loss of customer goodwill, disruption of physician and customer relationships, market confusion, impairment of launch momentum, and erosion of the substantial investments ESTIQ made to commercialize the TIAC II platform in the United States.

150. ESTIQ is entitled to compensatory damages in an amount to be determined at trial, together with temporary, preliminary, and permanent injunctive relief restraining Defendants from further interfering with ESTIQ's existing and prospective business relationships.

**COUNT VI: DECLARATORY JUDGMENT (Against El.En. and Cartessa)**

151. ESTIQ realleges and incorporates by reference Paragraphs 1 through 131 as though fully set forth herein.

152. An actual and justiciable controversy exists between ESTIQ and Defendants concerning: (i) the scope of ESTIQ's exclusive rights to market, sell, and distribute the TIAC II platform in the United States; (ii) Defendants' competing claims regarding those rights; and (iii) El.En.'s contention that ESTIQ failed to satisfy the Agreement's Year 1 minimum purchase requirement.

153. El.En. contends that ESTIQ failed to satisfy the Agreement's Year 1 minimum purchase requirement, despite El.En.'s acceptance and repeated confirmation of ESTIQ's purchase orders, El.En.'s failure to manufacture or deliver the ordered units, El.En.'s failure to

notify ESTIQ that the units were ready for shipment, and El.En.'s failure to issue invoices triggering any payment obligation.

154. El.En. further contends that ESTIQ's exclusivity is limited to devices branded bodyESTIQ and does not extend to ONDA, ONDA PRO, or other commercial names or variants of the TIAC II platform. ESTIQ disputes that position. The Agreement identifies TIAC II as a covered Product, grants ESTIQ exclusive rights in the United States, and recognizes "ONDA" as a proprietary mark associated with TIAC II. The parties' course of dealing, El.En.'s own communications, and the regulatory relationship between TIAC II and ONDA PRO confirm that TIAC II, bodyESTIQ, ONDA, and ONDA PRO are commercial names or variants of the same underlying technology platform.

155. Cartessa, despite notice of ESTIQ's exclusive rights, has marketed and promoted ONDA PRO in the United States and Canada, including by representing that ONDA PRO is exclusive to Cartessa Aesthetics in the United States and Canada. Cartessa's conduct creates an actual controversy concerning whether Cartessa may market, sell, distribute, or hold itself out as the exclusive United States distributor of ONDA PRO or other TIAC II products while ESTIQ's exclusive rights remain in effect.

156. A declaration of the parties' rights and legal relations is necessary and proper to resolve these controversies, prevent further market confusion, preserve ESTIQ's contractual rights, and determine whether Defendants may continue conduct that conflicts with ESTIQ's claimed exclusivity.

## **DEMAND FOR JURY TRIAL**

157. Plaintiff ESTIQ hereby respectfully requests trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ESTIQ prays for judgment against Defendants as follows:

A. Awarding specific performance and temporary, preliminary, and permanent injunctive relief directing El.En. to comply with its obligations under the Agreement and directing Defendants to cease all tortious interference with ESTIQ's contractual rights and prospective business relationships, including: (i) refraining from marketing, selling, distributing, or facilitating the sale of ONDA, ONDA PRO, bodyESTIQ, TIAC II, or any product incorporating TIAC II technology in the United States, through any channel other than ESTIQ; (ii) interfering with ESTIQ's exclusive United States distribution rights; (iii) holding out Cartessa or any other distributor as an authorized or exclusive United States distributor for any TIAC II product; (iv) diverting, soliciting, or interfering with ESTIQ customers, prospects, physician relationships, sales opportunities, or leads; (v) making any public or customer-facing statement suggesting that Cartessa is the exclusive or authorized United States distributor for ONDA PRO or any TIAC II product; and (vi) promoting ONDA PRO for facial or other uses outside the FDA-cleared indications for TIAC II or SPECCHIO.

B. Entering a declaratory judgment that (i) ESTIQ has not defaulted under the Agreement; (ii) that ESTIQ holds exclusive United States rights to market, sell, and distribute the covered TIAC II platform, including devices carrying various commercial names, including ONDA, ONDA PRO, or bodyESTIQ, during the term of the Agreement; (iii) that El.En. may not avoid ESTIQ's exclusivity by marketing, selling, distributing, authorizing, supporting, or facilitating the sale or distribution of the same TIAC II technology under different commercial names, including ONDA, ONDA PRO, or bodyESTIQ; and (iv) that Cartessa has no right to market, sell, distribute, commercialize, or hold itself out as the exclusive United States distributor of ONDA PRO or any covered TIAC II product in derogation of ESTIQ's rights;

C. Awarding ESTIQ compensatory damages for all claims asserted herein,

including damages arising from El.En.'s breach of the Agreement, El.En.'s breach of the implied covenant of good faith and fair dealing, Cartessa's tortious interference with the Agreement, Defendants' tortious interference with ESTIQ's prospective business relationships, and Cartessa's unfair competition, in an amount to be determined at trial.

D. Awarding ESTIQ disgorgement of Cartessa's ill-gotten gains arising from its unfair competition and misappropriation of ESTIQ's market-development efforts, goodwill, customer relationships, and commercial advantage;

E. Awarding ESTIQ attorneys' fees and costs to the extent permitted by law or contract; and

F. Such other and further relief as the Court deems just and proper.

Dated: September 16, 2026

**MICHELMAN & ROBINSON, LLP**

By: Alaina Cohen

Alaina B. Cohen
Madison Dini (*PHV application pending*)
Parul Aggarwal (*PHV application pending*)
605 Third Avenue, 30th Floor
New York, New York 10158
(212) 730-7700
acohen@mrllp.com
mdini@mrllp.com
paggarwal@mrllp.com

*Attorneys for Plaintiff ESTIQ, Inc.*